In re Stanley and Rena STRAUGHTER, Debtors.

CONSUMER UNITED CAPITAL CORPO- RATION, Successor in interest to Alle- gheny West Community Federal Credit Union, Plaintiffs,

v.

Stanley and Rena STRAUGHTER, Defendants.

Bankruptcy No. 95–16948. Adversary No. 96–0786.

United States Bankruptcy Court, E.D. Pennsylvania.

April 13, 1998.

Michael A. Cataldo, Cibik and Cataldo, Philadelphia, PA, for Debtors.

Joseph F. Riga, Hangley, Aronchick, Segal & Pudlin, Philadelphia, PA, for Consumer United Capital Corporation.

### MEMORANDUM OPINION[1]

JUDITH K. FITZGERALD, Bankruptcy Judge.

The matter before the court is Consumer United Capital Corporation's (CUCC) Complaint for Determination Excepting Debt From Discharge. On November 21, 1988, CUCC's predecessor in interest, Allegheny West Community Federal Credit Union and CUCC extended credit to Overlook, Inc., a Pennsylvania corporation whose principal shareholder was debtor Stanley Straughter. On April 8, 1989, Allegheny West assigned to CUCC all of its rights, title, and interest in certain documents that evidenced the transaction, including a Note and a Guaranty and Suretyship Agreement. Exhibit P13.

Evidence at trial established that in late 1987 or early 1988, Mr. Straughter sought a business loan of $25,000 and an equity infusion of $50,000 to enable Overlook, Inc., to rent space, purchase computers, obtain accounting and financial management programs, and utilize working capital to finance start-up costs on contracts committed to Overlook by customers in Philadelphia and the Virgin Islands. Exhibit P1. CUCC rejected the equity proposal but eventually approved a $75,000 loan. In his request for financing, Exhibit P1, Mr. Straughter stated that Overlook, Inc. had been fully operational in Philadelphia for the previous 18 months.[2] See Exhibit P3. Exhibit 'P–1 indicated that in that time, Overlook had marketed its products and services. Exhibit P1. The request for financing also stated that the corporation had "developed a network that allows us to sell its products and its clients [sic] products and services in forty-two states and the United States Virgin Islands". At trial, however, Mr. Straughter testified that although Overlook, Inc. was formed in 1982, it was inactive from then until 1988.

On May 23, 1988, the loan was approved by CUCC. Mr. Straughter, on behalf of Overlook, Inc., executed and delivered a Fixed Rate Note and Security Agreement. Rena Straughter was not a signatory to the underlying Note. Under the terms of the Note, credit was extended to Overlook, Inc. in the form of a loan in the amount of $75,000 which was to be repaid in installments.[3] To secure Overlook, Inc.'s obligations, both Debtors were required to and did execute a Guaranty and Suretyship Agreement dated November 21, 1988. Plaintiff's Exhibit P12 (hereafter "P12"). On April 20, 1992, Debtors executed and delivered to CUCC a Declaration of No Set Off (Exhibit P15) and an Affirmation of Guaranty and Forbearance Agreement (Exhibit P14) which was stated to be effective retroactively to December 31, 1991. The Affirmation provided, *inter alia,* that Debtors' obligations under the Note and Guaranty were valid, binding and enforceable against them individually and jointly. The proceeds were disbursed in or about November, 1988. Exhibit P14. On or about January 25, 1989, Debtors executed a $25,000 mortgage on their Cumberland Street property. This property was not their residence. Exhibit P11. The parties stipulated that there is $9,000 equity in this asset, after deducting senior encumbrances. Pretrial stipulation filed August 22, 1997, § VI.

Esther Carr–Davis, President of CUCC from 1987 until 1993, was responsible for reviewing all loan applications and for making recommendations to CUCC's loan committee. Ms. Carr–Davis testified that all of her contacts concerning the loan were with Mr. Straughter and that all supporting documentation was provided by him.

After the loan was approved and the funds disbursed, Debtors and Overlook, Inc. made payments sporadically. Payments were not made monthly or in the amount of $1,630.69,

---

1. The court's jurisdiction was not at issue. This Memorandum Opinion constitutes our findings of fact and conclusions of law.

2. The request for financing, although undated, was prepared and submitted not later than April 22, 1988, inasmuch as Mr. Straughter submitted a financial statement dated April 22, 1988, in support of the loan request and the loan was approved in May of 1988.

3. The Complaint speaks of 60 installments. At trial the testimony concerned 56 months. Exhibit P17 explains that the repayment would commence on the fourth month, with the balance payable in 56 months.

as required by the terms of the note. The loan has not been repaid in full.

In 1995 Debtors filed the instant bankruptcy case. CUCC filed this adversary proceeding in 1996 alleging that Debtors' obligations are nondischargeable on the basis of 11 U.S.C. § 523(a)(2)(A) and (B).

The relevant portions of § 523(a)(2) provide that a debt is nondischargeable if it was incurred

for money, property, services, or an extension, renewal, or refinancing of credit; to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive....

### A. Is Mrs. Straughter's Debt Nondischargeable?

We find first that the debt as to Mrs. Straughter is dischargeable. There was not a shred of evidence presented with respect to her except Mr. Straughter's uncontradicted testimony that her *only* involvement was signing the mortgage, guarantee and affirmation of guarantee. CUCC argues that because at the time of trial, in CUCC's opinion, she had the means to pay the obligation, Mrs. Straughter's failure to do so establishes that she incurred the obligation with the intent not to repay it. No evidence was introduced, however, concerning Mrs. Straughter's current ability to pay the loan. Moreover, the parties stipulated that this case was filed under chapter 13 on September 7, 1995, and converted to chapter 7 on January 26, 1996. Pretrial Stipulation filed August 22, 1997, § VI. Further, no evidence of Mrs. Straighter's intent at the time the obligation was incurred was presented. "[F]raudulent intent under section 523(a)(2)

or under section 727(a)(2) cannot be imputed from the mere fact that a wife derived benefit from her husband's conduct, or even that she had knowledge of his misconduct." *In re Towe,* 147 B.R. 545, 551 (Bankr.D.Mont. 1992), *aff'd.,* 97 F.3d 1461 (9th Cir.1996).

Moreover, there was no evidence that Mrs. Straughter provided the lender with any information of any nature, other than her signature. Thus, CUCC failed to meet its burden of proof under § 523(a)(2)(A) that Mrs. Straughter made a false representation and her debt is dischargeable.

### B. Is Mr. Straughter's Debt Nondischargeable Under § 523(a)(2)(A)?

Except for the request for financing, Exhibit P1, the dispute at trial centered on statements in writing prepared by Mr. Straughter concerning his financial condition. The issue regarding Exhibit P1 is whether information in this written request for funding constituted a false representation upon which CUCC justifiably relief. In *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), the Supreme Court held that, under § 523(a)(2)(A), the standard is justifiable, not reasonable, reliance. Where a creditor "ignores 'red flags' and fails to investigate warning signs that should arouse suspicion, reliance on the ... alleged implicit misrepresentation is unjustifiable." *In re Frye,* Bankr. No. 97–21879, Adv. No. 97–2303, slip op. at 4 (Bankr.W.D.Pa., April 3, 1998), citing *In re Feld,* 203 B.R. 360, 371 (Bankr.E.D.Pa.1996).

CUCC complains that two material misrepresentations were made: (1) that Overlook, Inc. was operational when the loan application was made and (2) that Overlook, Inc. had $475,000 worth of contracts to be performed.

The testimony established that Mr. Straughter was known to CUCC, to Esther Carr–Davis (its president), and to James Gibbons, president of CUCC's parent, both of whom had prior business dealings with Debtor. Although Mr. Straughter testified at trial that Overlook, Inc. was not operational until 1988, nothing in the record suggests that CUCC should have investigated Mr.

Straughter's representation in his request for financing that Overlook, Inc. had been fully operational for 18 months, which was a false representation.

■ The second issue, however, is not as clear. The request for financing identifies $475,000 in potential clients or contracts that Mr. Straughter referred to in the request. It states:

> ... within the next six (6) months we have firm commitments for contacts [sic] we expect to sign. The following is a partial listing of potential clients and contracts....

Exhibit P1. Mr. Straughter also testified that the listed items were service contracts and that marketing contracts were not included. Ms. Carr–Davis testified that neither the contracts nor the clients were investigated by CUCC before the loan was approved, although she appreciated the speculative nature and despite the fact that the information was relevant to the financial capability of the borrower—a material matter to CUCC. CUCC conducted no investigation and made no effort to confirm or deny whether Overlook actually operated or the firmness of the commitments by potential clients of Overlook. Ms. Carr–Davis testified that she had former business dealings with Mr. Straughter and relied upon that relationship in acting upon this loan application. We have been presented with no evidence upon which to conclude that CUCC was justified in relying on the estimates and potentialities identified in Exhibit P1, which were "red flags." We cannot find justifiable reliance under § 523(a)(2)(A). CUCC's witnesses admitted that they relied upon prior dealings with Mr. Straughter and not on Exhibit P1.

### C. Is Mr. Straughter's Debt Nondischargeable Under § 523(a)(2)(B)?

There is no dispute that the contested documents were statement in writing respecting Debtor's financial condition that the Debtor published. The issues are whether the information was materially false, published with the intent to deceive, and reasonably relied upon by the lender. The standard to be proven under § 523(a)(2)(B) is reasonable

reliance. *In re Cohn*, 54 F.3d 1108 (3d Cir. 1995).

With respect to nondischargeability under § 523(a)(2)(B), the evidence and testimony adduced at trial focused on Mr. Straughter's personal financial statement dated April 22, 1988, Exhibit P3, and related documents. Although the financial statement was not signed, Mr. Straughter testified at trial that he prepared it and gave it to CUCC in connection with this loan. It is a preprinted, standard form. Mr. Straughter filled in the blanks. CUCC established that Mr. Straughter's income for 1987 was materially misrepresented on the personal financial statement he provided. CUCC also established that Mr. Straughter's presentation in Exhibit P3 of the valuation of his interest in a company he owned, DAC International, Inc., was presented in a materially false and misleading manner.

Mr. Straughter was qualified as an expert with respect to calculating income, the value of personal assets, and elementary principles of valuation. In college he studied accounting and obtained a Bachelor of Arts degree in marketing. He took the CPA review course and studied for a doctorate in economics. He was an accounting clerk in the mid–1960s and worked as an accountant in the early 1970s. In the mid–1970s he worked for Leevy Redcross gathering data for the preparation of financial statements. From 1979 to 1981 he was the director of finance at Antioch School of Law. His duties included directing the staff that provided accounting services to the University and that processed student loan applications. From 1981 to 1983 he was Director of the National Consumers Bank where he received requests to fund low income cooperatives across the United States. He directed Leevy Redcross's business planning group from 1983 to 1985. In 1985 he became the senior vice president and principal shareholder at DAC International and was employed at least part of that year at Mitchell/Titus and Company, a certified public accounting and management consulting firm. In 1987 he became a shareholder in Overlook, Inc. This background substantiates Mr. Straughter's capa-

bility and knowledge in the preparation of financial statements.

The financial statement at issue dated April 22, 1988, Exhibit P3, lists total assets of $395,000, including $110,000 "Interest in Business Owned" identified as DAC International. Also listed, for the year ended December 1987, is salary of $66,000 and "Other Income" from consulting of $45,000. Mr. Straughter testified that he was never asked, and Ms. Carr–Davis's testimony is consistent that she did not inquire, about any of the items on his financial statement. Exhibit P21 is Debtors' joint 1987 federal income tax return dated April 28, 1990. The return shows Schedule C income of only $23,000 from Mr. Straughter's work as a management consultant with deductions exceeding $25,000, resulting in a loss for tax purposes of $2,637. Wages were listed as $40,059 and adjusted gross income as $41,038.

There is a substantial discrepancy between the $111,000 [4] total income listed on Exhibit P3 and Mr. Straughter's actual income for 1987. Mr. Straughter argues that he was unaware of his actual 1987 income until 1990, when he prepared his 1987 tax return. His assertion lacks credibility, given his education and work history. Moreover, the late preparation and filing of a tax return does not excuse misrepresentation on the financial statement that was prepared at or about the time of the loan, and nearly four months after the end of the 1987 calendar year for which the information was presented. Mr. Straughter testified at trial that the figures on the financial statement represent his earnings in 1987, not his income, some of which was payable in 1988. Again, his testimony lacks credibility. Mr. Straughter's work history establishes that he was familiar with financial statements and knew that they

depict assets, liabilities and net worth as of a particular date and Exhibit P3, which he prepared, so states. Mr. Straughter wrote on the document that his income through December, 1987, was $105,000. Mr. Straughter testified that he has experience with income projections and cash flow analysis. In this case, Mr. Straughter provided the financial statement to CUCC to justify his ability to repay the loan he sought. Nothing in the financial statement provides a clue that Mr. Straughter as not entitled to receive all of the income in 1987, the time period addressed in that portion of the document. We find that Mr. Straughter, with his expertise in financial matters, knew this and intentionally provided false information in order to induce CUCC to make the loan.

Mr. Straughter's interest in DAC International is listed on his financial statement as $110,000. He testified at trial that this amount included his original investment for a one-third interest in the company and $80,000 DAC International owed him in back salary. Mr. Straughter testified that he valued his one-third interest at $24,000 [5] because the purchase price of the stock was $71 per share and he held 333 shares. The shareholders decided that the value was $71 per share based on DAC International's March 31, 1987, financial statement, the shareholders' assessment of the value of equity, and their contributions to capital. Before March, 1988, he purchased another one-third interest for approximately $10,000. *See* Exhibit P26. Mr. Straughter testified that he did not include the value of that interest on the financial statement, although he owned the shares prior to submitting the document to CUCC. The loan was approved in May, 1988, and the balance of funds [6] was

---

4. Exhibit P3 incorrectly added $66,000 and $45,000 as a total of $105,000.

5. Mr. Straughter's testimony at trial concerning the $24,000 value of his initial interest plus the $80,000 back salary which he testified were the components of the value of his interest in the corporation total $104,000, not $110,000. Regardless of the arithmetic, the inclusion of back salary as an unqualified "interest in" the corporation was misleading.

6. Overlook, Inc. received an advance on the loan after it was approved but before the closing, but this does not affect our decision. George H. Johnson testified that he is the custodian of CUCC's records, CUCC itself in the process of dissolving. He is employed by Consumer United Insurance Company (CUIC), CUCC's parent. CUIC is in liquidation. Mr. Johnson testified that CUCC made advances on other loans as a normal part of its business, as it did with Overlook, Inc.

disbursed in November of that year, as evidenced by a letter dated December 4, 1989.

Accordingly, as of the date of Mr. Straughter's financial statement, his investment in DAC International was at best $34,-000 based on the value of his stock. He did not assert that he made a contribution to capital. He valued his interest on the value of the shares he owned plus back salary. His representation on the financial statement of interest in the corporation totaling $110,-000 in the context of this case was materially false and made with the intent to deceive. In the interest of full disclosure to CUCC, Mr. Straughter could have identified the $80,000 owed to him as back salary as a separate category or footnote on his financial statement.[7] Had the categorization been made, CUCC would have been on notice to inquire into such matters as the likelihood of collectability of the $80,000. As it was, CUCC was not presented with information in a manner that would lend itself to such an inquiry.

Additional evidence of the value of DAC International was provided at trial. By letter of December 4, 1989, on DAC International letterhead, Mr. Straughter advised Ms. Carr–Davis that before March of 1988 he bought another one-third interest in DAC International for $10,333, becoming chairman and chief executive officer of DAC International as a result. He also wrote that, at that time, DAC International was "heavily indebt-ed" to the IRS, that no contracts existed, and that DAC International was suffering from prior mismanagement. See Exhibit P26.

Mr. Straughter's testimony at trial established that the calculation of his interest in DAC on Exhibit P3 did not account for DAC International's huge deficit. Exhibit P22 is the financial statement of DAC International for the year ended March 31, 1988. This exhibit was prepared by a certified public accounting firm and was issued on December 29, 1988, based on information provided by management which, as of March, 1988, was Mr. Straughter. The corporate financial statement showed a "retained deficit" of $244,659 for the fiscal year ending March 31, 1988, and a net worth of *negative* $173,659. In reporting the value of his interest in DAC International on Exhibit P3, Mr. Straughter considered only his original one-third interest, the uncollectible $80,000 owed him in back salary and the value of key man insurance that would be paid to the corporation in the event of his death.[8] He testified that he did not know of DAC's deficit at the time of the loan application inasmuch as the financial statement was not prepared until December of 1988. His testimony is not credible in light of the facts that (1) his salary was unpaid; (2) he was DAC's CEO; (3) he had significant financial and accounting background; and (4) he had significant management experience in DAC and elsewhere.[9]

7. The preprinted form offers several choices in which to provide additional information such as "other assets—itemize" and "other income."

8. The reasonable inferences from this evidence and the time of the events is that Mr. Straughter was aware of these facts and the unlikelihood that he would realize his $80,000 in back salary when he completed his personal financial statement, dated April 22, 1988, listing the value of DAC International. Mr. Straughter also testified at trial that he considered the value of key man insurance in valuing DAC International which would pay $200,000 to the corporation in the event of his death. This does not affect the value of his interest in the corporation. None of this information was provided to Esther Carr–Davis, president of CUCC, who was responsible for overseeing loan applications and making recommendations to CUCC's loan committee.

9. In fact, Mr. Straughter was so involved with DAC International that the SBA required him to resign his position with Overlook, Inc. There is some question as to whether Mr. Straughter resigned from the presidency of Overlook, Inc. before or after the loan proceeds were disbursed. Defendants' Exhibit D is dated September 8, 1988, but the number "9" is handwritten over the final "8". Defendants' Exhibit R is a letter from an SBA employee in the Philadelphia Regional Office to the District Director of the SBA in Washington, D.C., dated March 21, 1989. That letter states that the Regional Office received Mr. Straughter's resignation from Overlook, Inc. This supports the finding that Mr. Straughter resigned from Overlook, Inc. after the loan was approved but before the money was disbursed. The loan commitment letter of May 25, 1988, Exhibit P7, states on page 4 that "Lender may terminate the Commitment by notice in writing to Borrower in the event that: . . . b. Prior to the closing of the loan, any material and substantial change adverse to the interests of Lender shall occur in the financial condition of Borrower or any guarantor of the loan from the condition represented in the loan application or

Mr. Straughter testified that he did not have Exhibit P22 available to him when he prepared Exhibit P3, his personal financial statement. However, a person with Mr. Straughter's experience and expertise and one with his position of control over DAC International in 1988 would or should have known to a reasonable certainty the true state of DAC International's affairs.

The evidence established to a preponderance that Mr. Straughter's misrepresentations on Exhibit P3 were intentionally and materially misleading. Mr. Straughter was financially savvy enough to know that DAC International's debt to him was not properly included without explanation in the valuation of his interest in DAC International. The $70,000 difference between Mr. Straughter's actual income in 1987 ($41,038 adjusted gross) and that represented on Exhibit P3 ($111,000) is, in these circumstances, material. Because we find that Mr. Straughter was aware of the true state of his finances, but provided false and misleading information instead, we find that the misrepresentation was made with the intent to deceive.

■■■ The question remains, however, whether CUCC reasonably relied on the false information provided by Mr. Straughter. The lender must establish reasonable reliance which is a question of fact judged by an objective standard. *In Re Cohn*, 54 F.3d 1108, 1117 (3d Cir.1995). A lender must exercise that degree of care which a reasonably cautious lender would exercise in the same transaction under similar circumstances. *Id.* The court in *Cohn* outlined three factors for assessing reasonable reliance:

(1) the creditor's standard practice in evaluating credit-worthiness (absent other factors, there is reasonable reliance where the creditor follows its normal business practices); (2) the standards or customs of the creditor's industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the infor-

mation supplied by debtor); and (3) the surrounding circumstances existing at the time of the debtor's application for credit (whether there existed a "red flag" that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations).

54 F.3d at 1117.

The loan sought was a Minority Enterprise Small Business Financial Investment Corporation (MESBFIC) loan. Ms. Carr–Davis testified that MESBFIC exists for riskier loans but she did not know whether Mr. Straughter applied elsewhere for financing. The Small Business Administration oversees the loans and provides matching funds. Ms. Carr–Davis testified that she had a long history putting together loan proposals for direct SBA funding and assisting others in obtaining SBA loans. To qualify for SBA approval of this type of loan, the following had to be established: (1) economic and financial feasibility, (2) reasonable assurance of repayment, and (3) the applicant company was of a particular size and minority owned. Ms. Carr–Davis devised the MESBFIC process for CUCC. She testified that this process included a review of the loan application, obtaining necessary information, and making the recommendation to the loan committee. She testified that she solicits and relies on information provided by the borrower. Ms. Carr–Davis testified that she relied on the documents previously discussed and on a "Corporate Capability Statement" prepared for Overlook, Inc. for 1987. The statement includes sections entitled "Corporate Services", "Corporate Principal", and "Staff and Consultants". Defendants' Exhibit F. She testified that she has known Mr. Straughter since the 1970s and had been involved in

any supporting documentation." The letter also provides that all obligations of the Borrower and any guarantor survived the closing and "shall be continuing obligations and undertakings, and shall not cease or terminate until the loan shall have been paid in full, and until all obligations

and undertakings of Borrower and any such guarantors shall have been fully completed and discharged." *Id.* at 5. We find that Mr. Straughter's resignation from Overlook, Inc. was a material change and his failure to disclose it contributed to the deceit he perpetrated on CUCC.

joint venture funding with him. She further testified that she was aware of his friendship with James Gibbons, the president of CUCC's parent, although Mr. Gibbons did not urge her to recommend the loan.

Mr. Straughter also had a history with CUCC. He testified that he met Mr. Gibbons through Leevy Redcross which was the certified public accounting firm for CUCC. When Mr. Straughter went to DAC International, CUCC was its landlord and a client. Mr. Straughter also ran a contract for CUCC's computer company and did other work for CUCC. When he approached Mr. Gibbons about the possibility of a loan, Mr. Gibbons told him that he would approve the loan.[10] Even though, according to Mr. Straughter, Mr. Gibbons told him the loan would be approved, there is no evidence that Mr. Gibbons played a part in Ms. Carr–Davis' recommendation to the loan committee or that Mr. Gibbons somehow influenced or demanded approval by other members of the committee. The evidence at trial established that Ms. Carr–Davis had a standard procedure which she followed in recommending loans and that she employed it in this instance, and that the loan committee accepted her recommendation.

In recommending approval by CUCC's loan committee, Ms. Carr–Davis relied on all the information provided by Mr. Straughter which included his net worth (Exhibit P3), his willingness to personally guarantee the loan, the dollar amount of the potential contracts ($475,000) (Exhibit P1), the amount of the loan ($75,000), the value of Mr. Straughter's interest in DAC International, Inc. (Exhibit P3), and Mr. Straughter's resume (Exhibit P20) in which he states that he is a "specialist in business development, financial management and systems analysis," and the borrower's financial capabilities. Because Exhibit P3 was dated April 22, 1988, almost a month after DAC International's fiscal year

ended, she had no reason to believe that the value listed as Debtor's interest in DAC International was an estimate or included back pay that was uncollectible. Nor was there any reason to believe that the income stated in the financial statement was not due as of December 1997 as stated in the document. There were no "red flags." Ms. Carr–Davis was not aware of the material change in Overlook, Inc.'s management as is detailed in footnote 9, *supra*. *See also* Defendants' Exhibit D. Exhibit P7 is the commitment letter which states, in part, that the loan would be made barring any material change in circumstances adverse to CUCC's interest. The evidence at trial established that Mr. Straughter's position with Overlook, Inc. was a very important factor in the extension of the loan to Overlook, Inc. His failure to notify CUCC of his resignation was in violation of the terms of the commitment and adverse to CUCC's interest.

Although there was no direct testimony concerning the standard in the industry for evaluating creditworthiness, we find that CUCC acted reasonably in relying on Mr. Straughter's financial statement under all of the circumstances in this case. It was reasonable for CUCC to rely on his representation that his interest in DAC International was $110,000. Nothing in the financial statement would alert a lender to question the valuation. What is more, Mr. Straughter was known to CUCC's president and its parent's president and had prior dealings with them as well as with CUCC itself. CUCC had no reason of record to question Mr. Straughter's valuation of his interest in DAC International.[11]

■ There was sufficient evidence to find the debt nondischargeable as to Mr. Straughter under § 523(a)(2)(B). His financial statement, Exhibit P3, which was provided to CUCC to support his request for a loan was materially false and misleading. We

---

10. Ms. Carr–Davis was not on CUCC's loan committee but was present as a guest at the meeting where the loan was approved. *See* Exhibit P6, Consumers United Capital Corporation Minutes of the Loan Committee, May 23, 1988. Mr. Gibbons is noted on the minutes as one of the members of the loan committee who was present.

11. Debtors' counsel pointed out at trial that CUCC never questioned Mr. Straughter concerning the value of other assets listed on Exhibit P3 such as an interest in a company called Medical Surgical Equipment Co. The financial statement, however, did not state a value for this company nor did the form request additional information about the interest.

find that Mr. Straughter intended to deceive CUCC with the false information provided in the financial statement and that CUCC reasonably relied on it.

### D. Attorney's Fees

The final issue is whether Debtors' counsel is entitled to attorney's fees under 11 U.S.C. § 523(d).[12] That section provides:

> If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

In light of our declaration that the debt is nondischargeable as to Mr. Straughter, fees for defending him are not recoverable. Furthermore, his debt was for a business, not a consumer, purpose. The question is whether Mrs. Straughter's dischargeable obligation under the Guaranty and Suretyship Agreement is a consumer debt. If so, fees may be awarded. It is undisputed that the purpose of the underlying debt was for business purposes. However, Mrs. Straughter was not a signatory to the underlying obligation. Her liability arises out of the Guaranty and Suretyship Agreement. Generally, a guaranty is a separate contract. A guarantor's liability is secondary and collateral. *Howard Sav. Bank. v. Cohen,* 414 Pa.Super. 555, 607 A.2d 1077, 1079 (1992). Notwithstanding this principle, Pennsylvania law provides that

> Every written agreement hereafter made by one person to answer for the default of another shall subject such person to the

liabilities of suretyship, and shall confer upon him the rights incident thereto, unless such agreement shall contain in substance the words: "This is not intended to be a contract of suretyship," or unless each portion of such agreement intended to modify the rights and liabilities of suretyship shall contain in substance the words: "This portion of the agreement is not intended to impose the liability of suretyship."

8 P.S. § 1. The guaranty in the matter before us provides specifically that "This Guaranty shall be an agreement of suretyship as well as of guaranty and without being required to proceed first against Borrower or any other person or entity, against any other security for the obligations under the Loan Documents, Lender may proceed directly against Guarantor...." Exhibit P12 at ¶ 3.

In contrast to a guarantor, a surety is bound with the principal. A surety is an original promisor, and the liability is original, primary and direct. *See generally, Howard Sav. Bank v. Cohen,* 607 A.2d at 1079. In *In re Bialon,* 67 B.R. 451 (Bankr.W.D.Pa. 1986), the court held that a nondebtor spouse guarantor of the debtor's obligation was primarily liable with the debtor inasmuch as the guaranty did not contain the exclusionary language of 8 P.S. § 1. As a result, creditors could reach entireties property to satisfy the debt. Based upon the foregoing, Mrs. Straughter's obligation cannot be considered a consumer debt.[13]

Even if the parties' agreement and Pennsylvania statute did not impose primary liability on her, case law suggests that her liability would not qualify as a consumer debt. In *In re Manning,* 126 B.R. 984 (M.D.Tenn.1991), *vacated on other grounds,* 1991 WL 628883 (6th Cir. Sept. 30, 1991), the court said that, although a family relationship

---

12. No itemized request for fees on behalf of Mrs. Straughter appears of record. However, counsel apparently requested $6,500 because the letter brief in opposition to an award of fees refers to that amount pursuant to a "Certification of Attorney's Fees in Support of Counterclaim" that was distributed to opposing counsel at trial. CUCC's counsel asserts that only .75 hours refer to Mrs. Straughter.

13. In addition, Mrs. Straughter signed the Affirmation of Guaranty and Forebearance Agreement and Declaration of No Set–Off on April 20, 1992. The Affirmation specifically makes the underlying obligations enforceable against her, individually and jointly, and contains an acknowledgment that the "Guarantors, recogniz[e] their direct and primary obligation under the Loan Documents to repay the Note in full...." Exhibit P14.

may establish a family purpose for the debt, the court must inquire as to why the debt was incurred. If the debt was incurred with a profit motive, it cannot be for family or household purposes and, therefore, does not qualify as a consumer debt. There was no evidence concerning Mrs. Straughter's individual purpose, but assuming, *arguendo*, that it was family oriented, the focus is on what *the debt* was intended to service. In this case the obligation provided funds for Mr. Straughter's business.

 In *Manning* the debtor bought a day care property for his sister because she could not afford it. The debtor had no intention of managing or operating it and it was not his purpose to gain income from it. The bankruptcy court held that it was a consumer debt. The district court reversed. The debtor purchased the day care property as an investment. He took depreciation and deducted the interest. In analyzing "consumer debt" the court noted that its definition in § 101 of the Bankruptcy Code is identical to the definition in the Truth in Lending Act. 15 U.S.C. § 1602(h). In order to qualify as a consumer debt, consumption must be involved. "Expenditures (loans for such expenditures) for the purpose of personal, family or household 'consumption' are for necessities or luxuries in daily existence." 126 B.R. at 989. An investment, on the other hand, is "an expenditure today for an expected return in the future." *Id.* Because the debt at issue was not used by either debtor in any consumer capacity, it was not a consumer debt.

In *In re Kestell*, 99 F.3d 146, 149 (4th Cir.1996), the court noted that an obligation is a consumer debt if it is not incurred with a profit motive *or in connection* with a business transaction. In the matter before us the underlying obligation was incurred in connection with a business transaction, even if Mrs. Straughter was not involved in the business. *Cf., Matter of Booth*, 858 F.2d 1051, 1055 (5th Cir.1988) (test under § 707(b) for determining whether a debt is a business debt as opposed to one for personal, family,

or household purposes is whether it was incurred "with an eye toward profit").

In *In re Funk*, 146 B.R. 118, 122 n. 6 (D.N.J.1992), the court stated that a mortgage secured by the debtor's residence is a consumer debt *if* the proceeds are not used for a business purpose. Here, the proceeds were used for Mr. Straughter's business and the mortgage was not against Debtors' residence. *See also In re Bernstein*, 71 B.R. 259 (Bankr.S.D.Fla.1987) (debtor borrowed $39,000 to pay his son's attorney's fees, incurred as president of a corporation in defending a fraud indictment; court held that the debtor's obligation was not a consumer debt).

Based on the foregoing, we conclude that Mrs. Straughter's obligation is not a consumer debt. Accordingly, the request for attorney's fees under § 523(d) will be denied.[14]

---

14. This Order does not affect an award of attorney's fees and costs by Judge Sigmund in favor

of Debtors on March 5, 1997, in the amount of $2,047.50, which remains in effect.